Emily Jones
  emily@joneslawmt.com
JONES LAW FIRM
2101 Broadwater Ave.
P.O. Box 22537
Billings, MT 59104
Telephone: 406/384-7990
*Local Counsel for Plaintiffs*

James Bopp, Jr. (IN #2838-84)*
  jboppjr@aol.com
Richard E. Coleson (IN #11527-70)*
  rcoleson@bopplaw.com
Courtney Turner Milbank (IN #32178-29)*
  cmilbank@bopplaw.com
Angela Stuedemann (IA #69956)*
  astuedemann@bopplaw.com
True the Vote, Inc., Voters' Rights Initiative
THE BOPP LAW FIRM, PC
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: 812/232-2434
*Pro hac vice application forthcoming
*Lead Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| **Joe Lamm**, **Ravalli County Republican Central Committee**, **Jeff Wagner**, **Sylvia Wagner**, **Fiona Nave**, **Brent Nave**, Plaintiffs, <br><br> v. <br><br> **Stephen Bullock**, in his official capacity as Governor of Montana; **Corey Stapleton**, in his official capacity as Secretary of State of Montana, <br><br> Defendants. | Case No.: _____ <br><br> **Plaintiffs' Preliminary-Injunction Memorandum** |

**Pls.' Prel. Inj. Mem.**

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Montana's safe system of in-person with no-excuse-absentee voting
        complies with Phase 2 reopening rules, obviating any justification for
        the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  As a matter of law, mailed ballots pose the greater fraud risk. . . . . . . . . . . 3

    C.  A sudden flood of mailed ballots poses serious risks to the right to vote. . 4

    D.  Voters are irreparably harmed by the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . 8

Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.   Voters are likely to succeed on the merits. . . . . . . . . . . . . . . . . . . . . . . . 14
       A.  The Plan violates the Elections Clause. . . . . . . . . . . . . . . . . . . . . . . . 14
       B.  The Plan violates the right to vote by imposing the substan-
           tial risk of *vote-dilution* disenfranchisement the legislative
           balancing rejected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
       C.  The Plan violates the right to vote by imposing the substan-
           tial risk of *direct* disenfranchisement the legislative balanc-
           ing rejected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
       D.  The Plan violates the right to vote and equal protection by
           empowering voters in some counties over others . . . . . . . . . . . . . . . . 24
    II.  A preliminary injunction is necessary to prevent irreparable harm to
       constitutional rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   III.  The balance of equities and the public interest support injunctive
       relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# Table of Authorities

*Cases*

*Andrade v. NAACP of Austin*, 345 S.W.3d 1 (Tex. 2011) . . . . . . . . . . . . . . . .  10-11

*Burdick v. Takushi*, 504 U.S. 428 (1992)  . . . . . . . . . . . . . . . . . . . . . .  18-19, 22-23

*Bush v. Gore*, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 15, 24-25

*Cook v. Gralike*, 531 U.S. 510 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Crawford v. Marion Cty. Elect'n Bd.*, 553 U.S. 181 (2008)  . . . .  3, 4, 16, 17, 20-23

*FEC v. Akins*, 524 U.S. 11 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016)  . . . . . . . 27

*Georgia Republican Party v. SEC*, 886 F.3d 1198 (11th Cir. 2018)  . . . . . . . . . . 12

*Giovani Carandola v. Bason*, 303 F.3d 507 (4th Cir. 2002) . . . . . . . . . . . . . . . . 27

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418
    (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gray v. Sanders*, 372 U.S. 368 (1963)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 3, 16-17

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014)
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)  . . . . . . . . . . . . . . . . . 9-10, 12

*LWV of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) . . . . . . . . . . . . . . 19

*Moore v. Ogilvie*, 394 U.S. 814 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012)  . . . . . 19

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reynolds v. Sims*, 377 U.S. 533 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26

*RNC v. DNC*, 140 S. Ct. 1205 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . 13, 26

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) . . . . . . . . . . . . . . . . . . . 12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) . . . . . . . . . . . . . . . . . . 13

*United States v. Salerno*, 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 21-23

*United States v. SCRAP*, 412 U.S. 660 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . 13

**Constitutions, Statutes, and Rules**
MCA 10-3-104(2)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

MCA 10-3-104(2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

MCA 13-1-101(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MCA 13-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

MCA 13-19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MCA 13-19-104(3)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

Mont. Const. art. III, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mont. Const. art. IV, § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 26

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25-26

**Pls.' Prel. Inj. Mem.**          iv

U.S. Const. art. I, § 4, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 16

U.S. const. art. II, § 1, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. art. IV, para. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. Const. pmbl. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

***Other Authorities***

Akpan, *What Fauci says the U.S. really needs to reopen safely*, National
    Geograhic, Aug. 13, 2020, nationalgeographic.com/science/2020/08/what-
    anthony-fauci-says-united-states-really-needs-to-reopen-safely-cvd/ . . . . . . . 2

Gov. Bullock, *Directive implementing Executive Orders 2-2020 and 3-2020
    and establishing conditions for Phase Two* (May 19, 2020), *available at*
    covid19.mt.gov/Portals/223/Documents/Phase%20Two%20Directive%20w
    ith%20Appendices.pdf?ver=2020-05-19-145442-350 . . . . . . . . . . . . . . . . . . . 1

CDC, *Considerations for Election Polling Locations and Voters* (updated June
    22, 2020), cdc.gov/coronavirus/2019-ncov/community/election-polling-
    locations.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Commission on Federal Election Reform, *Building Confidence in U.S. Elec-
    tions* (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Corasaniti & Saul, *Inside Wisconsin's Election Mess: Thousands of Missing or
    Nullified Ballots*, N.Y. Times, Apr. 9, 2020,
    nytimes.com/2020/04/09/us/politics/wisconsin-election-absentee-coronavirus.
    html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

E. Chemerinsky, *Constitutional Law: Principles and Policies* (3d ed. 2006)   10-11

Fessler & Moore, *More than 550,000 Primary Ballots Rejected in 2020, Far
    Outpacing 2016*, NPR, Aug. 22, 2020,
    npr.org/2020/08/22/904693468/more-than-550-000-primary-absentee-
    ballots-rejected-in-2020-far-outpacing-2016 . . . . . . . . . . . . . . . . . . . . . . . . . 5

Florio, *46 Montana counties file mail ballot plans*, Sept. 4, 2020,
    missoulian.com/news/state-and-regional/govt-and-politics/46-montana-

counties-file-mail-ballot-
plans/article_b14cfead-9bbc-5601-95c3-d69c0a0563f0.html . . . . . . . . . . 8, 24

Kaufman, *Postal service warns nearly every state it may not be able to delivery ballots in time based on current election rules*, CNN, Aug. 15, 2020,
cnn.com/2020/08/14/politics/usps-warn-states-mail-in-ballot-delivery/inde
x.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Levine, *Confessions of a voter fraud: I was a master at fixing mail-in ballots*,
The New York Post, August 29, 2020, nypost.com/2020/08/29/political-
insider-explains-voter-fraud-with-mail-in-ballots . . . . . . . . . . . . . . . . . . . . . . . 4

Manfredi, *USPS officials worry "supply chain" issues could impact mail bal-
lots: Report*, Fox Business, September 3, 2020,
foxbusiness.com/politics/senior-usps-officials-worried-issues-in-the-
supply-chain-could-prevent-voters-from-receiving-ballots-in-time-for-elec-
tion-day-report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Mauger, *'This can't go on': Detroit primary ballots went unchecked, GOP poll
challengers say*, Detroit News, Sept. 2, 2020,
detroitnews.com/story/news/politics/2020/09/02/republican-observers-say-
detroit-ballots-went-unchecked/5680540002/ . . . . . . . . . . . . . . . . . . . . . . . 6

Moretti, *What are costs of voting by mail?,* Electionline.org (2020),
electionline.org/electionline-weekly/2020-04-23 . . . . . . . . . . . . . . . . . . . . . . 7

Norden et al., Brennan Center for Justice, *Report: Estimated Costs of Covid-19
Election Resiliency Measures* (2020), brennancenter.org/our-
work/research-reports/estimated-costs-covid-19-election-resiliency-mea-
sures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Re, *Mail-in voting faces slew of issues nationwide, as emergency USPS memo
sounds alarm*, Fox News, July 22, 2020, www.foxnews.com/politics/mail-
in-voting-faces-slew-of-issues-nationwide . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

Ross, *More than 18,000 mail ballots not counted in Florida's March presiden-
tial primary*, Tampa Bay Times, June 29, 2020,
tampabay.com/news/health/2020/06/29/more-than-18000-mail-ballots-not-
counted-in-floridas-march-presidential-preference-primary . . . . . . . . . . . . . . 5

**Pls.' Prel. Inj. Mem.**                         vi

The Heritage Foundation, *A Sampling of Recent Election Fraud Cases from Across the United States*, heritage.org/voterfraud. . . . . . . . . . . . . . . . . . . . . . 3

Vogt, *All-Mail Pandemic Election Ends IN Fraud Charges Against NJ Politicians*, New Jersey 101.5, June 25, 2020, nj1015.com/all-mail-pandemic-election-ends-in-fraud-charges-against-nj-politicians/?trackback=fbshare_mobile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Warren, *Democrats Should Curb Their Enthusiasm for Mail-in Voting,* Politico, Sept. 2, 2020, politico.com/news/magazine/2020/09/02/democrats-mail-in-voting-407939 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Wise, *Postal Service Watchdog Outlines 'Concerns' Surrounding Election Readiness*, NPR, Sept. 1, 2020, npr.org/2020/09/01/908395806/postal-service-watchdog-outlines-concerns-surrounding-election-readiness . . . . . . . 6

C.A. Wright et al., *Federal Practice & Procedure* § 3531.10 (3d ed. 2008) . . . . 10

# Introduction

Plaintiffs ("Voters")[1] challenge (i) the Governor's Directive[2] ("Plan"), which allows counties to choose "mail ballot" voting[3] (with ballots sent without request) for the November 3, 2020 general election, and (ii) implementation by Secretary of State approving of county plans adopting the Plan, which together displace the legislative mandate expressly *barring* mail-ballot voting for "regularly scheduled federal ... election[s]," MCA 13-19-104(3)(a).

# Facts

### A. Montana's safe system of in-person with no-excuse-absentee voting complies with Phase 2 reopening rules, obviating any justification for the Plan.

As COVID-19 risk subsided, the Governor authorized Phase 2 of reopening as of June 1,[4] allowing groups over 50 to assemble in places where social distancing

---

[1] "Voters" herein includes voters, state-office candidates (also voters), and a political party (representing voters). Montana law references "electors," i.e., "individual[s] qualified to vote." Mont. Code ("MCA") 13-1-101(17).

[2] *See* Gov. Bullock, *Directive implementing Executive Orders 2-2020 and 3-2020 and providing for measures to implement the 2020 November general election safely* (Aug. 6, 2020)), covid19.mt.gov/Portals/223/Documents/2020-08-06_Directive%20-%20November%20Elections.pdf?ver=2020-08-06-112431-693. All hyperlinks herein were checked on September 7, 2020 or after.

[3] Montana allows "mail ballot elections" under limited circumstances. MCA 13-19, with such ballots called herein "**mail ballots**," as distinguished from by-request "**absentee ballots**" provided under MCA 13-13.

[4] *See* Gov. Bullock, *Directive implementing Executive Orders 2-2020 and 3-2020 and establishing conditions for Phase Two* (May 19, 2020), *available at* covid19.mt.gov/Portals/223/Documents/Phase%20Two%20Directive%20with%20Appendices.pdf?ver=2020-05-19-145442-350.

is possible, *id.* at 4, and recommending "face coverings while in public, especially in circumstances that do not readily allow for appropriate physical distancing (e.g., grocery/retail stores, pharmacies, public transportation)," *id.* at 3. Social distancing, masks, screens, sanitizing, and other safety measures are possible and recommended for polling places to protect voters and poll workers. CDC, *Considerations for Election Polling Locations and Voters* (updated June 22, 2020),

cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html. Asked if "people [can] safely ... vote in person... this year," Dr. Anthony Fauci, director of the U.S. National Institute of Allergy and Infectious Diseases, says yes:

> I think if carefully done, according to the guidelines, there's no reason that I can see why that not be the case. For example, when you look at going to a grocery store now in many regions and counties and cities that are doing it correctly, they have "X"s every six or more feet. And it says, Don't leave this spot until the person in front of you left their spot. And you can do that, if you go and wear a mask, if you observe the physical distancing, and don't have a crowded situation, there's no reason why you shouldn't be able to do that.

nationalgeographic.com/science/2020/08/what-anthony-fauci-says-united-states-really-needs-to-reopen-safely-cvd/ (interview transcript). Dr. Fauci noted that the minority specially at risk might wish to mail a ballot, *id.*, which is provided for by Montana's no-excuse-required absentee-ballot voting, MCA 13-13.

So Montana's system of in-person and absentee-ballot voting is safe and fully consistent with the Governor's own Phase 2. That makes the Plan factually unjustified, arbitrary, capricious, and irrational—in an election where the Governor him-

self is a U.S. Senate candidate. *See* stevebullock.com/.

**B.  As a matter of law, mailed ballots pose the greater fraud risk.**

The Supreme Court has already recognized (citing evidence)[5] that vote fraud occurs more with mailed ballots than in-person ballots, making that true as a matter of law. *Crawford v. Marion Cty. Elect'n Bd.*, 553 U.S. 181, 191-97 (2008); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) (same). In close races such fraud can swing elections. Since *Crawford* already recognized this risk, it *need not be proven*. Mail ballots pose an even greater threat than absentee ballots because mail ballots arrive unrequested to many addresses where individuals have moved, are temporarily gone due to COVID-19, are dead, etc., leaving unclaimed ballots available to those who would use them for vote fraud.

Though this fraud risk with mailed ballots need not be proven, examples abound in *Crawford*'s cited authorities and in The Heritage Foundation's *A Sampling of Recent Election Fraud Cases from Across the United States* with1,296 cases of documented voter fraud in recent years. *See* heritage.org/voterfraud. Recently, in Patterson, New Jersey, four men were charged with criminal election

---

[5] *Crawford* relied in part on the Carter-Baker Report, prepared by a bipartisan commission co-chaired by President Carter, which said mailed ballots are "the largest source of potential voter fraud" and are "likely to increase the risk of fraud and of contested elections." Commission on Federal Election Reform, *Building Confidence in U.S. Elections* 35, 46 (2005), *available at* bit.ly/3dXH7rU.

**Pls.' Prel. Inj. Mem.**                       3

fraud involving mail-ballot voting.[6] There was also evidence of a voter carrying numerous ballots and postal workers leaving ballots sitting out in building lobbies, making them available for fraudulent use.[7] A Democratic operative described his vote-fraud experience, noting it is "plenty common" and explaining schemes he's readily employed, including ballot harvesting, ballot tampering, coercion, and bribery.[8] These examples reenforce what *Crawford* established—that mailed ballots pose a real and higher risk of fraud that legislatures must balance in prescribing an election's manner.

## C. A sudden flood of mailed ballots poses serious risks to the right to vote.

Where states without a history of many mailed ballots suddenly create a flood of mailed ballots, that sudden flood poses serious risks to the right to vote. For example, absentee-ballot applicants risk not getting their ballot. *RNC v. DNC*, 140 S. Ct. 1205 (2020) (Ginsberg, J. dissenting) (the "surge in absentee-ballot requests has overwhelmed election officials, who face a huge backlog in sending ballots"). This problem plagued voters in states from Wisconsin to Georgia, where tens of

---

[6]   Vogt, *All-Mail Pandemic Election Ends IN Fraud Charges Against NJ Politicians*, New Jersey 101.5, June 25, 2020, nj1015.com/all-mail-pandemic-election-ends-in-fraud-charges-against-nj-politicians/?trackback=fbshare_mobile.

[7]   Re, *Mail-in voting faces slew of issues nationwide, as emergency USPS memo sounds alarm*, Fox News, July 22, 2020, www.foxnews.com/politics/mail-in-voting-faces-slew-of-issues-nationwide.

[8]   Levine, *Confessions of a voter fraud: I was a master at fixing mail-in ballots*, The New York Post, August 29, 2020, nypost.com/2020/08/29/political-insider-explains-voter-fraud-with-mail-in-ballots.

thousands of voters did not receive requested ballots. Verified Complaint ("VC"; Doc. 1) ¶¶ 61-67.

Mailed ballots are also more frequently rejected, with rejection rates 100 times in-person voting.[9] An NPR analysis found that more than 550,000 ballots were rejected in this year's presidential primaries,[10] many in key battleground states where state and national results could be determined by small margins. *Id.* Minority voters' ballots are rejected at higher rates, with research indicating that African Americans, young people, and first-time voters are less likely to have their ballots counted due to noncompliance with technical requirements or late arrival.[11] VC ¶¶ 82-85.

Election workers, overwhelmed by the sudden flood, have less ability to carefully review mailed ballot to screen out fraudulent ones, creating a substantial risk that fraudulent votes will be counted. Sometimes they simply don't check mail bal-

---

[9] Warren, *Democrats Should Curb Their Enthusiasm for Mail-in Voting,* Politico, Sept. 2, 2020, politico.com/news/magazine/2020/09/02/democrats-mail-in-voting-407939.

[10] Fessler & Moore, *More than 550,000 Primary Ballots Rejected in 2020, Far Outpacing 2016*, NPR, Aug. 22, 2020, npr.org/2020/08/22/904693468/more-than-550-000-primary-absentee-ballots-rejected-in-2020-far-outpacing-2016.

[11] Ross, *More than 18,000 mail ballots not counted in Florida's March presidential primary*, Tampa Bay Times, June 29, 2020, tampabay.com/news/health/2020/06/29/more-than-18000-mail-ballots-not-counted-in-floridas-march-presidential-preference-primary.

lots.[12]

Widespread problems have occurred with U.S. Postal Service ("USPS") delivery, including ballots lost and arriving post-election.[13] Sudden floods exacerbate this, with problems in primaries becoming worse in general elections. A recent audit revealed potential postal problems, noting several facilities reviewed "did not always comply with election and political mail readiness procedures."[14] USPS officials are concerned voters won't receive ballots in time for election day due to production capacity and their ability to meet election deadlines.[15] VC ¶¶ 93-96. The USPS warned nearly every state of a risk ballots may not be returned in time to be counted.[16] The USPS inspector general detailed concerns over USPS's ability to

---

[12] Mauger, *'This can't go on': Detroit primary ballots went unchecked, GOP poll challengers say*, Detroit News, Sept. 2, 2020, detroitnews.com/story/news/politics/2020/09/02/republican-observers-say-detroit-ballots-went-unchecked/5680540002/ .

[13] Corasaniti & Saul, *Inside Wisconsin's Election Mess: Thousands of Missing or Nullified Ballots*, N.Y. Times, Apr. 9, 2020, nytimes.com/2020/04/09/us/politics/wisconsin-election-absentee-coronavirus.html.

[14] Wise, *Postal Service Watchdog Outlines 'Concerns' Surrounding Election Readiness*, NPR, Sept. 1, 2020, npr.org/2020/09/01/908395806/postal-service-watchdog-outlines-concerns-surrounding-election-readiness.

[15] Manfredi, *USPS officials worry "supply chain" issues could impact mail ballots: Report*, Fox Business, September 3, 2020, foxbusiness.com/politics/senior-usps-officials-worried-issues-in-the-supply-chain-could-prevent-voters-from-receiving-ballots-in-time-for-election-day-report.

[16] Kaufman, *Postal service warns nearly every state it may not be able to delivery ballots in time based on current election rules*, CNN, Aug. 15, 2020, cnn.com/2020/08/14/politics/usps-warn-states-mail-in-ballot-delivery/index.html.

handle the influx of mailed ballots in the general election, despite recent actions by Postmaster General DeJoy.

Mail-ballot voting is more expensive and complicated than in-person voting. Estimated costs of "maintaining in-person voting" nationally are $271.4 million, while providing all Americans with a "vote by mail option" would cost between $982 million and $1.4 billion.[17] With the increased costs of mail-ballot voting versus in-person voting, and no increased funding provided by the legislature, given the Governor's unilateral action, Montana election officials may not be able to afford to properly administer additional mail ballots.

Finally, mail ballots could lead to a delay and uncertainty in election results, which voters in New York City and Philadelphia experienced in their primary elections. VC ¶¶ 103-104. While a delay in results in primary elections is one thing, experts fear the "constitutional crisis" that could occur if the results of November's presidential election remain unknown for days or weeks.[18] VC  ¶¶ 105-106.

Though the Montana Association of Counties wrote Governor Bullock a letter

---

[17] Norden et al., Brennan Center for Justice, *Report: Estimated Costs of Covid-19 Election Resiliency Measures* (2020), brennancenter.org/our-work/research-reports/estimated-costs-covid-19-election-resiliency-measures; *see also* Moretti, *What are costs of voting by mail?,* Electionline.org (2020), electionline.org/electionline-weekly/2020/04-23 (mail voting more expensive).

[18] Re, *Mail-in voting faces slew of issues nationwide, as emergency USPS memo sounds alarm*, Fox News, July 22, 2020, foxnews.com/politics/mail-in-voting-faces-slew-of-issues-nationwide

requesting the Plan and claiming "success" in the mail-ballot primary, the primary had problems, including some just outlined. Thousands of voters in Gallatin and Lewis and Clark counties didn't get ballots or got wrong ballots, and Mizzoula County's Election Administrator admitted that "since it was an all mail ballot election, we had a lot of undeliverable ballots." VC ¶¶ 107-112. The turnout for general elections is historically much higher than for primaries, and a reported 46 of 56 Montana counties have filed mail-ballot plans,[19] so there will be a ballot flood.

## D.  Voters are irreparably harmed by the Plan.

Plaintiffs include registered, eligible voters who intend to vote in the November election, who will be harmed if the Plan remains in force. VC ¶¶ 5-10. First, there will not be an Elections-Clause-compliant election. Second, the flood of ballots will be beyond the abilities of election workers to adequately process and monitor, resulting in more illegal ballots and vote-dilution disenfranchisement. Third, the flood of ballots that will be beyond the abilities of USPS and election workers (who were all expecting and preparing for the normal number of absentee ballots) to adequately handle, will result in ballots not sent, lost ballots, and tardy ballots, resulting in direct disenfranchisement. Fourth, Plaintiffs living outside counties choosing the Plan will suffer a violation of their one-person-one-vote rights. The

---

[19] Florio, *46 Montana counties file mail ballot plans*, Sept. 4, 2020, missoulian.com/news/state-and-regional/govt-and-politics/46-montana-counties-file-mail-ballot-plans/article_b14cfead-9bbc-5601-95c3-d69c0a0563f0.html.

harms are irreparable; elections lack do-overs. Plaintiffs Joe Lamm and Fiona Nave are local candidates, who have the same risk of direct and vote-dilution disenfranchisement as other Voters along with the added interest that they are likely to lose ballots cast for them from voters suffering such disenfranchisement. VC ¶¶ 5, 9. Plaintiff Ravalli County Republican Central Committee asserts the interests of its members, who include registered, eligible voters who intend to vote and thus have the voter harms stated above. The Committee's mission is to educate, motivate, and assist voters to elect Republicans and help Republicans get elected. VC ¶ 6.

# Standing

Voters meet the standing requirements of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), because they suffer personal harm that is traceable to the Governor's Plan, and the Secretary of State's implementation of it, and is redressable by requested relief. In particular, their equal-protection claim (Count IV) provides readily recognized standing for persons in counties that do not elect mail-ballot voting and are thus disadvantaged by the increased voting power of voters in counties who elect mail-ballot voting under the analysis of *Bush v. Gore*, 531 U.S. 98, 107 (2000) (and cited cases). And other claims aren't generalized grievances under *Lujan*'s two formulations of that doctrine:

> [1] a plaintiff raising only a generally available grievance about government—claiming only harm to his and *every citizens*'s interest in proper appli-

cation of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy,

*id.* at 560-61 (emphasis added), and

[2] an injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable ... [and] cannot alone satisfy the requirements of Art. III ...,"

*id.* at 575-76 (internal quotation marks and citation omitted). So there are two issues: (1) whether the claimant is just a *citizen* trying only to make the government do its job without more and (2) whether the claim the same claim held by "every citizen." Because the first issue is more specific, it is the core of the analysis. "[T]he proper inquiry is whether the plaintiffs sue solely as *citizens* who insist that the government follows the law." *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 8 (Tex. 2011) (citing E. Chemerinsky, *Constitutional Law: Principles and Policies* 91 (3d ed. 2006)) (emphasis added). "[N]either *citizens* nor taxpayers can appear before a court simply to insist that the government and its officials adhere to the requirements of law." C.A. Wright et al., *Federal Practice & Procedure* § 3531.10 (3d ed. 2008) (emphasis added). Thus, mere "citizen" standing is the issue, and the present challenge is not a generalized grievance under the first or second question.

First, Voters don't bring their claims under mere "citizen" standing. Rather, they assert personal harms from the violation of their own fundamental right to vote that is protected by the First and Fourteenth Amendments and U.S. Const. art.

I, § 4, cl. 1. Given the Supremacy Clause, U.S. Const. art. IV, para. 2, state offi-
cials must obey constitutional mandates. Voters' claims are also particularized.
They don't challenge anything not directly bearing on their claims, so they are not
just trying to make the government do its job in some general way but rather chal-
lenge that which particularly violates their rights. So they are no mere citizens try-
ing to make government do its job.

Second, Voters assert a harm that is not the same as for every "citizen." "The
bar is based not on the number of people affected—a grievance is not generalized
merely because it is suffered by large numbers of people." *Andrade*, 345 S.W.3d at
7 (citing Chemerinsky, *Constitutional Law* 91). "[D]enying standing to persons
who are in fact injured simply because many others are also injured, would mean
that the most injurious and widespread Government actions could be questioned by
nobody." *United States v. SCRAP*, 412 U.S. 660, 686-68 (1973). "[W]here a harm
is concrete, though widely shared, the Court has found injury in fact." *FEC v.
Akins*, 524 U.S. 11, 24 (1998). Voters' claim of harm here is actually three levels
of specificity below any harm suffered by "citizens." (1) Within the class of citi-
zens are *registered* voters; only those registered could suffer vote dilution. (2)
Within the class of registered voters are *eligible* voters; only the eligible have a
right to vote that could suffer direct or vote-dilution disenfranchisement. (3)
Within the class of registered, eligible voters are those who *actually vote*; only

**Pls.' Prel. Inj. Mem.**                11

those who actually vote can have that vote lost or diluted by illegal votes. So Voters' claims are particularized and not even close to *Lujan*'s citizen-standing definition of a generalized grievance.

That such voters have standing is also apparent for two other reasons. First, an election is the key opportunity for "We the People," U.S. Const. pmbl., to exercise their constitutional sovereignty in this democratic Republic, so elections are precisely about voters exercising their rights and they must be able to challenge harms to those rights. Second, political parties are routinely permitted to assert the voting rights of their members in a representational capacity, but that depends *solely* on the fact that those voting members have standing. For example, *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), held that for representational standing an organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm" or that "*all* the members of the organization are affected by the challenged activity"), *id.* at 498-99. *Cf. Georgia Republican Party v. SEC*, 886 F.3d 1198, 1203-05 (11th Cir. 2018) (rejecting political party standing for not establishing that a member had standing). So individual voters necessarily have standing to challenge harms to their voting rights.

Moreover, Plaintiff Ravalli County Republican Central Committee represents voters and has its own interest in electing Republican candidates just like other political parties whose standing is typically recognized in such cases. Plaintiffs Joe

**Pls.' Prel. Inj. Mem.**            12

Lamm and Fiona Nave are voters and also state legislative candidates. As candidates they will be harmed if votes for them are lost or diluted, if the election is not conducted in the legislature's prescribed manner, and if voters in some counties have greater voting power than those in others.

# Argument

The Ninth Circuit uses a sliding-scale preliminary-injunction test:

> Plaintiffs ... must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit weighs these factors on a sliding scale, such that where there are only "serious questions going to the merits"—that is, less than a "likelihood of success" on the merits—a preliminary injunction may still issue so long as "the balance of hardships tips *sharply* in the plaintiff's favor" and the other two factors are satisfied.

*Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citations omitted) (emphasis in original). "An allegation of future injury may suffice if ... there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). On the merits-success prong, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

# I.
## Voters are likely to succeed on the merits.

Voters are likely to succeed on the merits of each of their four claims.

**A.  The Plan violates the Elections Clause.**

The Plan violates Voters' right to have and vote in a federal election under the Elections Clause, which mandates that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof ....." U.S. Const. art. I, § 4, cl. 1.[20] Federal candidates are on the November ballot, including the Governor. The legislature expressly *barred* mail-ballot voting for such "regularly scheduled federal ... election[s]," MCA 13-19-104(3)(a). Yet, though the Governor is not the legislature, Mont. Const. art. III, § 1 (separation of powers); *id.* art. IV, § 3 (legislature regulates elections), his Plan allows counties to choose mail-ballot voting for the November election.

No statutory authority can override these constitutional mandates, but even so, no authority that the Plan cites authorizes displacing the legislature's election-manner monopoly. It cites MCA 10-3-104(2)(a), but Montana's election laws regulate a federal election, so they are not "regulatory statute[s] prescribing the procedures for conduct of state business or orders or rules of any state agency" that may be suspended in limited circumstances, *id.* Anyway, the legislative mandate is consistent with the Governor's Phase 2 restrictions, *supra* Facts(A), so there is no interference with "necessary action in coping with the emergency ...," *id.* The Plan cites

---

[20] The "Manner" "encompasses ... '... supervision of voting, protection of voters, prevention of fraud and corrupt practices ....'" *Cook v. Gralike*, 531 U.S. 510, 523-24 (2001) (citation omitted).

MCA 10-3-104(2)(c), but since the legislative mandate is consistent with Phase 2, "compliance ... would [*not*] in any way prevent, hinder, or delay necessary action in coping with the emergency," *id.*

That the Elections Clause provides a cause of action is clear from *Bush*, 531 U.S. 98, which included as an issue the claimed violation of the similarly worded Electors Clause (legislature prescribes election's manner): "whether the Florida Supreme Court established new standards for resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the United States Constitution." 531 U.S. at 103. Given this recognized issue, such provisions may be the basis of claims, though in *Bush* the Court did not reach that issue.

**B.  The Plan violates the right to vote by imposing the substantial risk of *vote-dilution* disenfranchisement that the legislative balancing rejected.**

The Plan violates the right to vote because it poses a substantial risk of vote-dilution disenfranchisement by the inclusion of unlawful votes. This risk is cognizable as a matter of law and fact.[21]

As a matter of law, a substantial risk of vote-dilution and direct disenfranchisement exists when an election is not conducted in the legislature's prescribed manner. This is because the legislature has the exclusive authority and expertise to balance voting access with election-integrity issues, which include the higher risk of

---

[21] Facts regarding the risks of mailed ballots are set out in Facts(B), *supra*, and the complaint. VC ¶¶ 47-112. Here the focus is on the matter-of-law aspect.

fraud posed by mail ballots established in *Crawford*. *Supra* Facts(B). So the "legislative balance" in state election law is the binding finding of what is safe for *this* state in *this* election to prevent such vote-dilution and direct disenfranchisement. Consequently, the Plan violates the right to vote as a matter of law because it allows what the legislature did *not* allow in its legislative balancing because it posed a substantial risk of such disenfranchisement.

The foregoing is well-supported law. The U.S. Constitution "confers on states broad authority to regulate the conduct of elections, including federal ones." *Griffin*, 385 F.3d at 1130 (citing U.S. Const. art I, § 4, cl.1). "[S]triking ... the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a *legislative* judgment . . . ." *Id.* at 1131 (emphasis added). There is no right to vote by mail and mailed ballots pose special fraud risks, so only the legislature has the authority and is equipped to balance access and integrity in the mailed-ballot context. *Id.* at 1130-31.

The legislative balancing cannot be gainsaid based on what other states do because only *this* state's legislature has authority to balance and mandate what is needed in *this* state, including prescribing a manner that allows only a modest amount of mail voting, which curtails the risk posed by mailed ballots by keeping them to a modest percentage of all votes. "[S]tates that have more liberal positions ... may well have different political cultures ..., cultures less hospitable to election

fraud." *Id.* So "[o]ne size need not fit all." *Id.*

Nor can the legislative balancing be gainsaid on the notion that a particular safeguard isn't needed because the legislature provided other safeguards. The legislature thought they *all* were required in its balancing. Specifically, as *Griffin* and *Crawford*, 553 U.S. at 193-96, recognize there is a known and greater risk of fraud with mailed ballots than in-person voting. Knowing that risk, the legislature tightens or loosens mailed-ballot access to control the approximate percentage of mailed ballots on the basis of perceived risk, which is essential to prevent direct disenfranchisement because the U.S. Postal Service ("USPS") and election workers are overwhelmed by a sudden flood of mailed ballots for which they were unable to plan, resulting in lost and tardy ballots and vote-dilution because overwhelmed screeners are unable to do as careful a job of screening out illegal ballots. Maintaining the legislative balance is vital because "confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy" and "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

So as a matter of law, the risk of illegal votes is real and cognizable here, the increase in illegal votes will dilute legal votes, and vote dilution is a form of forbidden disenfranchisement. The fundamental right to vote is well-established: "[T]he Constitution of the United States protects the right of all qualified citizens

**Pls.' Prel. Inj. Mem.** 17

to vote, in state as well as in federal elections" and to have that vote counted. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* at 555. As the Plan will flood the state with a quantity of mail ballots that the legislative balancing already determined unsafe, voters as a matter of law suffer a substantial risk that their votes will be diluted by illegal votes, which establishes vote-dilution disenfranchisement.

Another useful way to analyze the Plan is under *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), which is used to evaluate a "state election law," *id.* at 434. The Plan actually *displaces* the "state election law," but *Burdick*'s balancing approach is useful to evaluate both the original state election law (banning mail ballots) and the Plan's purported justifications for replacing the legislative balancing. *Burdick* requires "weighing 'the character and magnitude of the asserted injury to the rights ... that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (citation omitted). Strict scrutiny applies to "'severe' restrictions," but "reasonable, nondiscriminatory restrictions" only get rational-basis review and typically survive, *id.* at 434. As disenfranchisement is a severe burden, *see, e.g.*, *LWV*

**Pls.' Prel. Inj. Mem.**                    18

*of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012), Defendants must prove that (i) the Plan is narrowly tailored to a compelling governmental interest and (ii) the original statute is not a reasonable, nondiscriminatory restriction that is rationally justified by the legislative balancing of access and integrity.

Regarding balancing interests, the legislature already has done the necessary balancing. It had the authority and the expertise to decide to ban mail ballots in general federal elections. That is reasonable, nondiscriminatory, and rationally based on its expert balancing of access and integrity. That should end the matter. But Defendants' purported justification for the Plan is COVID-19, which is not compelling for two reasons. First, existing election law is fully compliant with Phase 2 generally, with by-request absentee-ballot voting available with no required excuse for the minority specially at risk, so there was no need for the Plan. *Supra* Facts(A).

Second, measured against the benchmark for a permissible burden established in *Crawford*, 553 U.S. 181, the burdens of complying Phase 2 requirements for in-person voters or requesting an absentee ballot for other voters don't amount to a cognizable burden, let alone a compelling one. *Crawford* held it not unreasonable to require those lacking photo identification to vote to bear "the inconvenience of going to the Bureau of Motor Vehicles, gathering required documents, and posing

for a photograph" to get a free ID card because that did "not qualify as a substantial

burden on most voters' right to vote ...," *id.* at 198 (Stevens, J., joined by Roberts,

C.J., and Kennedy, J.) (controlling op.). And that burden was mitigated by the fact

that voters could vote a provisional ballot and then "travel to the circuit court

clerk's office within 10 days to execute the required affidavit." *Id.* at199. And that

burden "is unlikely ... [to] pose a constitutional problem ...." *Id.* "And even assum-

ing that the burden may not be justified as to a few voters, that conclusion is by no

means sufficient to establish" the facial relief sought. *Id.* at 199-00. These reason-

able burdens were closely related to legitimate state interests in "election moderni-

zation" (including cleaning up voter roles recognized to contain unqualified vot-

ers), preventing "voter fraud," and "safeguarding voter confidence." *Id.* at 192-97.

Since the burden of required travel and inconvenience in *Crawford* was reasonable

and justified for the voter-identification requirement despite some possible harm to

some persons, Defendants must prove any burden here is substantially greater and

not similarly a reasonable requirement for most people. But practicing the recom-

mended safeguards for engaging in essential activities is no greater burden than the

burden found reasonable in *Crawford*, so it is a reasonable, nondiscriminatory re-

striction that is readily justified in balancing by state interests in election integrity.

And even if the legislative mandate might be a problem for a small number, that in

no way justifies the facial replacement of the legislative mandate with the Plan. *Id.*

**Pls.' Prel. Inj. Mem.** 20

at 199-200. Requesting an absentee ballot is no burden under *Crawford*.

Turning to tailoring, given that the Plan is a broad facial remedy for perceived problems with the legislative balancing, Defendants must satisfy the test in *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid"). So at a minimum, the remedy of the Plan should have been as-applied to those specially at risk. Instead, the Plan replaced the legislative balancing with an overbroad mail-ballot Plan. That overbreadth alone dooms the Plan under *Burdick*. As the Supreme Court said when applying *Burdick* and *Salerno* in *Crawford*, one ought not invalidate the whole provision.

> A facial challenge must fail where the statute has plainly legitimate sweep. When we consider the statute's broad application to all Indiana voters, we conclude that it imposes only a limited burden on voters' rights. The precise interests are advanced by the State are therefore sufficient to defeat petitioners' facial challenge. ... [P]etitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute.

553 U.S. at 202-03 (quotation marks and citations omitted). This tailoring analyses proves Defendants cannot meet their burden to prove the Plan narrowly tailored to a compelling state interest. It even fails rational-basis analysis.

**C.  The Plan violates the right to vote by imposing the substantial risk of *direct* disenfranchisement the legislative balancing rejected.**

The Plan violates the right to vote because it poses a substantial risk of direct disenfranchisement by lost or tardy votes. This risk is also cognizable as a matter of law and fact.[22]

The analysis parallels that in Part I.B, *supra*, which discussed direct disenfranchisement somewhat. As a matter of law, a substantial risk of direct disenfranchisement exists when an election is not conducted in the legislature's prescribed manner because it balanced voting access with election-integrity issues, which include the substantial risk of lost or tardy mailed ballots when there is the sudden flood of mailed ballots described in Facts(C), *supra*. The Plan violates the right to vote as a matter of law because it allows what the legislature did *not* allow since it posed a substantial risk of such disenfranchisement.

And under *Burdick*, 504 U.S. at 434, the legislature already has done the necessary balancing. It had the authority and expertise to ban mail ballots in general federal elections, which was reasonable, nondiscriminatory, and rationally based on its expert balancing of access and integrity. That should end the matter. Defendants' purported COVID-19 justification is not compelling because existing election law is fully compliant with Phase 2 generally, with by-request absentee-ballot voting

---

[22] Facts regarding the risks of mailed ballots are set out in Facts(C), *supra*, and the complaint. VC ¶¶ 59-112. Here the focus is on the matter-of-law aspect.

available for any specially at risk. Measured against *Crawford*'s benchmark for a permissible burden, the burdens of complying with Phase 2 requirements for in-person voters or requesting an absentee ballot are not cognizable. And possible burdens for a few doesn't justify the overbroad Plan.

Regarding tailoring, Defendants must satisfy the *Salerno* test, 481 U.S. at 745, and at most the Plan should have provided only an as-applied remedy for those specially at risk. It did not. That overbreadth alone dooms the Plan under *Burdick*, *Salerno*, and *Crawford.*  Defendants cannot meet their burden to prove the Plan narrowly tailored to a compelling state interest. It even fails rational-basis review.

### D.  The Plan violates the right to vote and equal protection by empowering voters in some counties over others.

A reported 46 of 56 Montana counties have filed mail-ballot plans.[23] If the plans are approved, voters in the 46 counties will have greater voting power than other-county voters. The Plan enhances the overall odds of voters in counties adopting the Plan being able to vote and have their votes counted (while violating the legislature's controlling balancing of access and integrity by creating a substantial risk of ballot fraud and lost or tardy ballots). As a result, proportionally more votes will be obtained from in-Plan counties than from other counties—with the

---

[23] Florio, *46 Montana counties file mail ballot plans* (Sept. 4, 2020), missoulian.com/news/state-and-regional/govt-and-politics/46-montana-counties-file-mail-ballot-plans/article_b14cfead-9bbc-5601-95c3-d69c0a0563f0.html.

difference not being accounted for by population differences. From a political perspective, mining extra votes from counties where one political party dominates favors that political party at the expense of voters in other counties of a different political persuasion as happened in Florida in *Bush*, 531 U.S. 98, where Democrats mined Democrat-leaning counties instead of the whole state.

But empowering voters in one county to the disadvantage of voters in other counties violates a long line of one-person-one-vote authority that requires that citizens in one county not be disadvantaged compared to voters in other counties—precisely what the Supreme Court held was an impermissible violation of the right to vote (by dilution of vote values in other counties) and the Equal Protection Clause of the Fourteenth Amendment as discussed in *Bush*. As *Bush* noted, the voters of one county may not have "greater voting strength":

> An early case in our one-person, one-vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties. *Gray v. Sanders*, 372 U.S. 368 (1963). The Court found a constitutional violation. We relied on these principles in the context of the Presidential selection process in *Moore v. Ogilvie*, 394 U.S. 814 (1969), where we invalidated a county-based procedure that diluted the influence of citizens in larger counties in the nominating process. There we observed that "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Id.*, at 819.

*Id.* at 107. (Note that this analysis doesn't turn just on *Bush* because the Court there relied on a series of cases.) The same disparate treatment occurred in the 2020 Florida election, where the Florida Supreme Court's plan was to include totals

from two counties though "each of the counties used varying standards to deter-
mine what was a legal vote. Broward County used a more forgiving standard than
Palm Beach County, and uncovered almost three times as many new votes, a result
markedly disproportionate to the difference in population between the counties."
*Id.* Because of this and similar equal-protection violations causing and risking vote
dilution, "[s]even Justices of the Court agree[d] that there [were] constitutional
problems with the recount ordered by the Florida Supreme Court that demand[ed] a
remedy." *Id.* at 111. The Florida Supreme Court should have implemented a sys-
tem *without* greater voting strength for one group, just as Montana must have a
neutral, uniform voting system. But the Plan violates that. Just as the Florida plan
had to be enjoined, the Plan must be enjoined.

                              *   *   *

   As Plaintiffs have a strong likelihood of success on their claims, other
preliminary-injunction factors follow, particularly since the right to vote is based
on the First and Fourteenth Amendments. At a minimum, "'the balance of hard-
ships tips *sharply* in [Plaintiffs'] favor' and the other two factors are satisfied."
*Short*, 893 F.3d at 675 (citation omitted).

# II.

## A preliminary injunction is necessary to prevent
## irreparable harm to constitutional rights.

Plaintiffs have irreparable harm for reasons tracking their claims. *See also su-*

*pra* Facts(D). They have no remedy at law if the Plan is implemented and the elec-

tion held in violation of their rights. If the Plan is implemented, their rights to vote,

equal protection, and an Elections Clause compliant election. Because "the right of

suffrage is a fundamental matter in a free and democratic society." *Reynolds*, 377

U.S. at 561-62 (1964), "[c]ourts routinely deem restrictions on fundamental voting

rights irreparable injury," *League of Women Voters of N.C. v. North Carolina*

("*LWVNC*"), 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases). "[O]nce the

election occurs, there can be no do-over and no redress," making the injury to

"voters ... real and completely irreparable if nothing is done to enjoin [the chal-

lenged] law." *LWVNC*, 769 F.3d at 247. "[T]here are no mulligans" where voters

are disenfranchised by denial of requested relief. *Fla. Democratic Party v. Scott*,

215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016). And the harm is imminent because

the election is November 3 and the Plan is already being implemented.

# III.

## The balance of equities and the public interest support injunctive relief.

Where as here, Voters will suffer violations of their constitutional rights, the

public interest requires their protection. A state suffers no harm if likely unconsti-

tutional actions are preliminarily enjoined. *See, e.g.*, *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). "[U]pholding constitutional rights surely serves the public interest." *Id.* While safeguarding public health is a governmental interest, the Plan is unjustified by COVID-19 concerns because the existing legislative balancing was fully consistent with Phase 2. *See* Facts(A). Vitally, following the legislature's own balancing, i.e., following the rule of law, is strongly in the public interest and should outweigh all because only the legislature is authorized and equipped to balance such interests and prescribe the election's manner. The balance of harms and public interest favor the requested relief.

## Conclusion

This Court should grant the preliminary-injunction motion.

September 9, 2020                                    Respectfully submitted,

                                                    /s Emily Jones
James Bopp, Jr. (IN #2838-84)*                      Emily Jones
  jboppjr@aol.com                                     emily@joneslawmt.com
Richard E. Coleson (IN #11527-70)*                  JONES LAW FIRM
  rcoleson@bopplaww.com                             2101 Broadwater Ave.
Courtney Turner Milbank (IN #32178-29)              P.O. Box 22537
  cmilbank@bopplaw.com                              Billings, MT 59104
Angela Stuedemann (IA #69956)                       Telephone: 406/384-7990
  astuedemann@bopplaw.com                           *Local Counsel for Plaintiffs*
True the Vote, Inc.
  Voters' Rights Initiative
THE BOPP LAW FIRM, PC
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: 812/232-2434
*Pro hac vice application forthcoming
*Lead Counsel for Plaintiffs*

**Pls.' Prel. Inj. Mem.**                    28

# Certificate of Compliance

I certify that the foregoing document complies with Local Civil Rule

7.1(d)(2)(E) because it contains 6,486 words according to the word processing pro-

gram used, excluding portions excluded by local rule.

/s Emily Jones
Emily Jones
  emily@joneslawmt.com
JONES LAW FIRM
2101 Broadwater Ave.
P.O. Box 22537
Billings, MT 59104
Telephone: 406/384-7990
*Local Counsel for Plaintiffs*

# Certificate of Service

I hereby certify that I caused the foregoing document to be served via first class

U.S. Mail on September 9, 2020, on all defendants:

Governor Stephen Bullock
PO Box 200801
Helena, MT 59620-0801

Secretary of State Corey Stapleton
Montana Capitol Building, Rm 260
P.O. Box 202801
Helena, MT 59620-2801

/s Emily Jones
Emily Jones

**Pls.' Prel. Inj. Mem.**          30