IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; MONTANA REPUBLICAN STATE CENTRAL COMMITTEE, | CV 20–66–H–DLC

(Consolidated with Case No. CV–20–67–H–DLC) |

Plaintiffs,

and

GREG HERTZ, in his official capacity as Speaker of the Montana House of Representatives; SCOTT SALES, in his official capacity as President of the Montana Senate, on behalf of the Majorities of the Montana House of Representatives and the Montana Senate,

Intervenor-Plaintiffs,

vs.

STEPHEN BULLOCK, in his official capacity as Governor of Montana; COREY STAPLETON, in his official capacity as Secretary of State of Montana,

Defendants,

and

ORDER

1

DSCC, DCCC, and MONTANA
DEMOCRATIC PARTY,

                    Intervenor-
                    Defendants.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Burdick v. Takushi*, 504 U.S. 428, 441 (1992).  As this case illustrates, protecting this right during a global pandemic presents unique challenges.  Indeed, jurisdictions across the country have had to make difficult decisions about their electoral processes, often balancing the interests of public health against the interests of ensuring their citizens can adequately exercise their franchise.  Montana is no exception.

This litigation requires the Court to determine the constitutionality of Governor Bullock's August 6, 2020 directive permitting counties to conduct the November 3, 2020 general election, in part, by mail ballot ("the Directive").  Plaintiffs in the lead case (CV 20–66–H–DLC) ("Lead-Plaintiffs"), Intervenor-Plaintiffs, and Plaintiffs in the member case (CV–20–67–H–DLC) ("Member-Plaintiffs") (collectively "the Plaintiffs") ask this Court to permanently enjoin

enforcement of the Directive.  (Docs. 1 at 34; 1 at 39;[1] 38 at 21–22.)  Additionally,

Member-Plaintiffs seek to enjoin Secretary Stapleton's approval of proposals from

counties seeking to conduct the November 3, 2020 general election, in part, by

mail ballot.  (Doc. 1 at 39.)

In response, Defendant Stephen Bullock ("Governor Bullock") and

Intervenor-Defendants (collectively referred to as "Defendants") assert that not

only do Plaintiffs' claims fail, but jurisdictional hurdles preclude the issuance of

the relief they seek.  (*See generally* Docs. 73–74; 81.)  For the reasons stated

herein, the Court finds that while it has jurisdiction over the dispute, the Plaintiffs'

claims are without merit.  Accordingly, the Plaintiffs' prayers for relief will be

denied and judgment in Defendants' favor will be entered.

In many respects, this case requires the Court to separate fact from fiction.

As referenced throughout this Order, the parties have provided the Court with

considerable evidence in the form of declarations and documents.  Central to some

of the Plaintiffs' claims is the contention that the upcoming election, both

nationally and in Montana, will fall prey to widespread voter fraud.  The evidence

suggests, however, that this allegation, specifically in Montana, is a fiction.

---

[1] As discussed below, this Court has consolidated the lead case (CV 20–66–H–DLC) and
member case (CV–20–67–H–DLC) pursuant to Federal Rule of Civil Procedure 42(a)(2).  (Doc.
45.)  Citation to document "1 at 39" refers to document 1 as it exists in the member case (CV–
20–67–H–DLC) pre-consolidation.  Throughout this Order citations to certain documents
reference documents filed only in the member case (CV–20–67–H–DLC).

When pressed during the hearing in this matter, the Plaintiffs were compelled to concede that they cannot point to a single instance of voter fraud in Montana in any election during the last 20 years.  Importantly, Montana's use of mail ballots during the recent primary election did not give rise to a single report of voter fraud.  This is due, in large part, to the fact that Montana has a long history of absentee voting by as many as 73% of its electorate, combined with the experience, dedication, and skill of Montana's seasoned election administrators.  Thus, there is no record of election fraud in Montana's recent history, and it is highly unlikely that fraud will occur during the November 3, 2020 general election.  This is fact, which should provide comfort to all Montanans, regardless of their political persuasion, that between now and November 3, 2020 they will be participating in a free, fair, and efficient election.

**BACKGROUND**

## I.    Factual Background

The COVID-19 pandemic constitutes a serious global health risk that has paralyzed most of the world.  As with the rest of the United States, Montana has not been immune to the virus' effect on society.  In response to COVID-19's worldwide outbreak, on March 12, 2020, Governor Bullock issued an executive order declaring a state of emergency within Montana.  (Doc. 81-8.)  Notably, on March 13, 2020, Governor Bullock amended his prior executive order "to run concurrent to the

emergency declaration of the President of the United States," after President Donald J. Trump declared a national state of emergency earlier that day.  (Doc. 81-9.) Currently, both the United States and Montana remain in states of emergency because of the COVID-19 pandemic.

As Montana's 2020 primary election approached, Governor Bullock issued a directive permitting counties to "conduct the June 2 primary election under the mail ballot provisions of Title 13, Chapter 19."  (Doc. 81-10 at 4.)  Pertinent to this case, Governor Bullock rooted this directive in the suspension power vested in him by Montana Code Annotated § 10-3-104(2)(a) by suspending Montana Code Annotated § 13-19-104(3)(a)'s prohibition on the use of mail ballots for a "regularly scheduled federal . . . election."  (*Id.* at 2, 4.)  Interestingly enough, one of the Intervenor-Plaintiffs in this case, the Speaker of the Montana House of Representatives, Greg Hertz, expressed his "full support" for the directive which, in his view, allowed "counties to choose what is best for their voters and election staff during this state of emergency."  (Doc. 81-20 at 3.)

Following Montana's successful June 2, 2020 primary election, which resulted in a record 55% turnout rate, the Montana Association of Counties and the Montana Association of Clerk & Recorders wrote to Governor Bullock applauding his prior directive, and urging him to issue a similar directive for the November 3, 2020 general election.  (*See generally* Doc. 81-2.)  On August 6, 2020, Governor

Bullock issued the Directive, which, as with Montana's primary election, permits, but does not require, counties to "conduct the November 3, 2020 election under the mail ballot provisions of Title 13, Chapter 19, MCA." (Doc. 81-15 at 4.) As with the prior directive, Governor Bullock relies on the suspension power vested in him by Montana Code Annotated § 10-3-104(2)(a), to render Montana's prohibition on the use of mail ballots for federal elections ineffective. (*Id.* at 2.) Pursuant to the Directive, 45 of Montana's 56 counties have opted to conduct the November 3, 2020 general election by mail ballot.[2]

## II.    Procedural Background

Lead-Plaintiffs filed suit on September 2, 2020 advancing several constitutional challenges to the Directive. (Doc. 1.) Specifically, Lead-Plaintiffs' complain that the Directive violates: (1) Article I, Section IV of the United States Constitution by changing the time, place, and manner of the November 3, 2020 general election without legislative involvement; (2) Article II, § I of the United States Constitution by changing the manner in which Montana appoints electors for the November 3, 2020 general election without legislative involvement; and (3) their rights under the Fourteenth Amendment of the United States Constitution by facilitating fraud and other illegitimate voting practices. (Doc. 1 at 31–33.)

---

[2] These 45 counties are home to 680,315 of Montana's 720,355 registered voters, or 94% of the State's total electorate. Of note, the Directive does not abandon in-person voting, which will occur in all of Montana's 56 counties.

Following the filing of this complaint, the DCCC, DSCC, and the Montana Democratic party moved to intervene as defendants and Greg Hertz and Scott Sales, on behalf of the Republican majorities of the Montana House of Representatives and the Montana Senate, moved to intervene as plaintiffs. (Docs. 28; 33.) The Court permitted such intervention and placed the Plaintiffs' motion for preliminary injunctive relief on an expedited schedule. (Doc. 35.) The Intervenor-Plaintiffs have asserted claims identical to those advanced by the Lead-Plaintiffs. (Doc. 38.)

A nearly identical lawsuit was filed by Member-Plaintiffs on September 9, 2020. (Doc. 1.) In that case, the Plaintiffs' complain that the Directive violates: (1) Article I, Section IV of the United States Constitution by changing the time, place, and manner of the November 3, 2020 general election without legislative involvement; (2) their right to vote by "vote-dilution disenfranchisement" on account of the "cognizable risk of ballot fraud from mail-ballot elections"; (3) their right to vote by "direct disenfranchisement" on account of "the sudden surge in mail in ballots" resulting in "requested ballots never" arriving or arriving too late and "filled-out ballots" getting lost or delayed in the return process; and (4) their right to vote and the Equal Protection Clause of the Fourteenth Amendment by providing greater voting power to voters in counties that elect to send mail ballots than voters in the 11 counties that do not. (Doc. 1 at 33–38.)

Given the common questions of law and fact that exist in the lead case (CV 20–66–H–DLC) and the member case (CV–20–67–H–DLC), this Court consolidated the actions.  (Doc. 45.)  The Court additionally consolidated determination of the Plaintiffs' motions for preliminary injunctions (Docs. 2; 8) with a trial on the merits.  (Doc. 69.)[3]  A hearing on this matter was held on September 22, 2020.

## LEGAL STANDARD

An injunction "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  In adjudicating requests for injunctive relief, this Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Id.*  In doing so, it is imperative that this Court "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Id.*  As outlined below, the injunctive relief Plaintiffs request would severely impede Montana's administration of the November 3, 2020 general election.

To obtain the injunctive relief they seek, the Plaintiffs must demonstrate: (1)

---

[3] It also bears noting that the Intervenor-Defendants have moved to dismiss the Lead-Plaintiffs' complaint (Doc. 1) and for judgment on the pleadings.  (Doc. 72.)  Because the legal issues raised in this motion (Doc. 72) share the Court's analysis with respect to the issuance of injunctive relief, the Court finds separate analysis of this motion unnecessary.

actual success on the merits; (2) that they have suffered an irreparable injury; (3) there exists no adequate remedy at law; (4) the balance of the hardships justifies a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction. *Independent Training & Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013) (citing *eBay Inc. v. MerchExch., LLC*, 547 U.S. 388, 391 (2006). When the government is a party, the final two factors merge into one. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

In applying these elements, the Court is mindful that "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction" and that cases interpreting the preliminary injunction standard apply "with equal force to . . . permanent injunction cases." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (internal citations omitted). In considering these legal standards, the Court finds that the Plaintiffs have failed to carry the burden necessary to warrant the imposition of permanent injunctive relief.

## ANALYSIS

Given the complexity of this action, the Court finds it necessary to discuss how it categorizes the Plaintiffs and their claims. Plaintiffs can be split into three distinct groups. The first group, referred to as the "Organizational Plaintiffs," consists of the Lead-Plaintiffs and the Ravalli County Republican Central

Committee, a party in the member case (CV–20–67–H–DLC).  The Organizational

Plaintiffs are various committees involved in efforts designed to improve

Republican electoral prospects in Montana.  (Docs. 1 at 3–5; 1 at 6.)

The second group, referred to as the "Legislative Plaintiffs," is composed of

the Intervenor-Plaintiffs, including Greg Hertz, Speaker of the Montana House of

Representatives, and Scott Sales, President of the Montana Senate.  (Doc. 38 at 4–

5.)  Legislative Plaintiffs allege they were authorized by a majority of each

chamber of the Montana Legislature to bring this action.  (*Id.*)  Finally, the third

group, referred to as the "Candidate and Voter Plaintiffs," constitute voters and

candidates (who, critically, also intend to vote) for public office in Montana.  (Doc.

1 at 3–4.)

Additionally, the Court finds that some of Plaintiffs' claims rest on

sufficiently analogous legal grounds to warrant simultaneous attention.  First, there

are the "Emergency Powers Claims" which, in essence, allege that the Directive

violates the Elections and Electors Clauses of the United States Constitution, by

permitting Governor Bullock to alter the time, place, and manner of Montana's

federal elections and process for appointing Presidential electors without

legislative involvement.  (*See Id.* at 33–34; 1 at 31–32; 38 at 18–19.)

Second, there are the "Right to Vote Claims" which are premised on the

contention that the Directive will disenfranchise voters by: (1) opening the door to

10

voter fraud; and (2) creating such an influx of mail ballots in the postal system that "requested ballots never arrive or arrive too late and filled-out ballots get lost or are delayed in the return process." (*See* Doc. 1 at 34–37; 1 at 33; 38 at 20–21.) Third, there is the "Equal Protection Claim," asserted by the Member-Plaintiffs, which alleges that the Directive violates the Fourteenth Amendment because voters in counties that opted to conduct the election by mail ballot have a greater chance of having their votes counted. (Doc. 1 at 37–38.) Pursuant to this analytical framework, the Court proceeds first to the issue of jurisdiction.

## I.    Jurisdictional Issues.

Defendants have raised the following jurisdictional issues: (1) whether the Eleventh Amendment bars Plaintiffs' Emergency Powers Claims; (2) whether Plaintiffs lack standing to prosecute this action; and (3) whether the Court should abstain from adjudication. Each issue shall be discussed in turn.

### A.    The Eleventh Amendment.

Defendants maintain that Plaintiffs' Emergency Powers Claims are barred by the Eleventh Amendment. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. A literal reading would, of course, compel only the conclusion

that Montana is immune from suits in federal court brought by persons who are not citizens of Montana.  But this is not the law.

Indeed, the Supreme Court has construed the Eleventh Amendment "to stand not so much for what it says, but for the presupposition" it confirms, namely, that a state is not "amenable to the suit of an individual without its consent."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (internal citations omitted).  That is, the Eleventh Amendment is not governed by its text, but rather by "a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity."  *Puerto Rico Aqueduct and Sewer Auth. V. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).  Sovereign immunity acts a shield, depriving the Court of jurisdiction over suits that are otherwise justiciable. *See Federal Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 754 (2002).

But this shield is not impenetrable.  Long ago, the Supreme Court carved out a "necessary exception" to the general rule that the Eleventh Amendment prevents individuals from suing states in federal court.  *Puerto Rico*, 506 U.S. at 146.  In *Ex Parte Young*, the Supreme Court held that the Eleventh Amendment does not preclude prospective enjoinment of a state official for ongoing violations of federal law.  209 U.S. 123, 155–56 (1908).  This exception "gives life to the Supremacy Clause" by "vindicat[ing] the federal interest in assuring the supremacy" of federal

law.  *Green v. Mansour*, 474 U.S. 64, 68 (1985).

While *Ex Parte Young*'s general rule has survived, its underlying theory

"has not been provided an expansive interpretation."  *Pennhurst State School &*

*Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).  In *Pennhurst*, the Supreme Court

extended (in fact, contracted) its prior Eleventh Amendment jurisprudence by

holding that the Eleventh Amendment prohibits federal courts from ordering state

officials to comply with state law.  465 U.S. at 103–17.  Thus, under *Pennhurst*,

suits brought against state officials in federal court that complain of violations of

state law alone, remain barred by the Eleventh Amendment.  More precisely, under

the Eleventh Amendment, federal courts have no business compelling state

officials to comply with state law.

Predictably, the parties disagree on *Pennhurst*'s application to the present

suit.  Defendants contend that although Plaintiffs' complain of violations of the

federal constitution, the interpretation of state law necessary to resolve the merits

of those complaints renders the claims barred by the Eleventh Amendment.  In

other words, Defendants contend that the Plaintiffs have brought claims based

solely on state law under the guise of a federal constitutional claim.  Plaintiffs

respond that while their federal claims certainly require this Court's interpretation

of state law, their claims are firmly rooted in the United States Constitution and are

thus constitutionally permissible under the Eleventh Amendment.  The Court finds

13

Plaintiffs' position persuasive.

The Supreme Court in *Pennhurst* acknowledged that the doctrine of *Ex Parte Young* exists to, above all else, "promote the vindication of federal rights." 465 U.S. at 105. With that in mind, the Court finds that it would undercut *Ex Parte Young* completely to conclude that simply because a federal constitutional claim requires the interpretation, or rests on the purported violation of, state law, it suddenly comes within *Pennhurst'*s grasp. Indeed, if the presence of underlying state law issues in a federal constitutional claim was sufficient to deprive this Court of jurisdiction under *Pennhurst*, then *Ex Parte Young* would no longer perform the necessary function of protecting the supremacy of federal law.

The Plaintiffs complain of violations of federal law and seek an injunction rectifying the resulting injury. Specifically, in their Emergency Powers Claims, Plaintiffs contend that Governor Bullock, not the "Legislature," has altered the time, place, and manner of Montana's federal elections in contravention of the United States Constitution. As addressed at length below, the state law issues underlying these claims guide but by no means dictate their resolution. Critical to the outcome of these claims is a determination of what exactly the term "Legislature" in the Elections and Electors Clauses means—and depending on the answer— whether injunctive relief halting their violation should issue. This is quintessentially a federal question. In short, the Court finds Plaintiffs have

14

asserted proper *Ex Parte Young* claims and no Eleventh Amendment barrier blocks
adjudication.

### B.    Standing.

Defendants maintain Plaintiffs lack standing to prosecute this action.  "It is a
fundamental precept that federal courts are courts of limited jurisdiction."  *Owen
Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  This notion is derived
from the United States Constitution itself, which limits the Court's subject matter
jurisdiction to justiciable "cases" or "controversies."  U.S. Const., Art. III, § 2.
The federal courts' limited jurisdiction "is founded in concern about the proper—
and properly limited—role of the courts in a democratic society."  *Summers v.
Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (internal citations omitted).

As such, it is incumbent upon this Court to ascertain whether subject matter
jurisdiction exists before analyzing the merits of a litigant's claims.  *Arbaugh v.
Y&H Corp.*, 546 U.S. 500, 514 (2006).  Indeed, this Court is to presume it is
without jurisdiction to hear a case until a contrary showing is made.  *Stock West,
Inc. v. Confederates Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th
Cir. 1989).  Subject matter jurisdiction is "the courts' statutory or constitutional
power to adjudicate the case."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,
89 (1998).  This includes underlying concepts such as standing.  *In re Palmdale
Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011).  The doctrine of standing

requires "federal courts to satisfy themselves that the plaintiff[s have] alleged such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction." *Summers*, 555 U.S. at 493 (internal citations and quotation marks omitted).

In order to establish standing, Plaintiffs must show "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Critically, the threshold question of whether Plaintiffs possess standing "precedes, and does not require, analysis of the merits." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).

Moreover, the "standing analysis which prevents a claim from being adjudicated for lack of jurisdiction, [cannot] be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true." *Catholic League for Religious and Civil Rights v. City and Cty. of S.F.*, 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc). Finally, because Plaintiffs seek equitable relief, not damages, the Court "need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Townley v. Miller*, 722

16

F.3d 1128, 1133 (9th Cir. 2013).  With this in mind, the Court therefore examines

whether at least one Plaintiff possesses standing.

### 1.    Organizational Plaintiffs.

Defendants maintain the Organizational Plaintiffs have neither

representational or direct organizational standing.  Each is discussed in turn.

### i.    Representational Standing

Representational standing exists when an organization's "members would

otherwise have standing to sue in their own right, the interests at stake are germane

to the organization's purpose, and neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit." *Friends*

*of the Earth*, 528 U.S. at 181.  The Plaintiffs do not seem to contest, and the Court

finds, that the interest at stake—ensuring that Republican voters can exercise their

franchise—is germane to the Organizational Plaintiffs' respective purposes.  The

Court can likewise dispose of the third requirement at the outset, because when

injunctive relief is sought, participation of the individual members "is not normally

necessary." *United Food and Commercial Workers Union Local 751 v. Brown*

*Group, Inc.*, 517 U.S. 544, 546 (1996).  Thus, the Court will focus its analysis on

the first prong of the representational standing inquiry.

Defendants assert that the Organizational Plaintiffs' members complain of

nothing more than generalized grievances insufficient to confer Article III

standing.  The Court agrees, as it must, that generalized grievances do not normally

constitute a particularized injury necessary to establish standing.  *Novak v. United*

*States*, 795 F.3d 1012, 1018 (9th Cir. 2015).  But the fact that "a harm is widely

shared does not necessarily render it a generalized grievance."  *Id.* (internal

citations and quotation marks omitted).  In fact, the Supreme Court has been clear

that "where large numbers of voters suffer interference with voting rights" the

interests related to that are sufficiently concrete to obtain the standing necessary to

seek redress in an Article III Court.  *F.E.C. v. Akins*, 524 U.S. 11, 24 (1998)

(holding that claims implicating voting rights "the most basic of political rights, is

sufficiently concrete and specific" to establish standing); *see also Baker v. Carr*,

369 U.S. 186, 206–07 (1962) (noting that prior cases have "squarely held that

voters who allege facts showing disadvantage to themselves as individuals have

standing to sue").

The Court finds that injuries related to voter rights are central to the

Organizational Plaintiffs' claims and stem directly from issuance of the Directive.

Because the alleged injuries to the members' voting rights at issue in this case

could conceivably be asserted by any Montanan does not eradicate the standing

necessary to assert these claims.  On the contrary, the Supreme Court has

repeatedly enumerated the principle that claims alleging a violation of the right to

vote can constitute an injury in fact despite the widespread reach of the conduct at

issue.  In short, the harm complained of here is sufficiently concrete to pass the Organizational Plaintiffs through the standing gateway necessary to adjudicate their claims on the merits.[4]

### ii.      Organizational Standing

Even if the Organizational Plaintiffs' lacked representational standing the Court finds they similarly enjoy organizational standing.  The test of whether an organizational plaintiff has standing is identical to the three-part test outlined above normally applied in the context of an individual plaintiff.  *La Asociacion de Trabajordores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  An organization establishes the requisite injury upon a showing of "both a diversion of its resources and a frustration of its mission."  *Id.*  But, as Defendants correctly note, the Organizational Plaintiffs cannot simply "spend money fixing a problem" for the purpose of manufacturing standing.  *Id.*  Instead, the Organizational Plaintiffs are required to demonstrate "it would have suffered some other injury if it had not diverted resources to counteracting the problem."  *Id.*  The Court is persuaded the Organizational Plaintiffs have established a diversion of resources sufficient to confer standing.

---

[4] The Court likewise finds that this legal conclusion supports a finding of standing for the Voter and Candidate Plaintiffs, who similarly allege infringements on their right to vote.  (Doc. 1 at 3–4.)  Because the Candidate Plaintiffs allege they intend to vote, the Court need not address whether they possess standing to prosecute their claims as candidates.

Defendants contest this form of standing by asserting that Organizational Plaintiffs have nothing to educate their members about, since the Directive expands rather than contracts the opportunity to vote.  But this assertion cannot withstand scrutiny.  The Directive, while certainly expanding the remote voting opportunities of Montanans, necessarily contemplates a reduction in available in-person voting opportunities by counties that opt-in to the mail ballot option.  (Doc. 81-15 at 5.)  As the supplemental declaration provided by the Member-Plaintiffs establishes, there is a "73% drop in the number of in person polling places open to Montanans who want to vote in person on Election Day across the state."  (Doc. 109-1 at 3.)  This reduction requires the Organizational Plaintiffs' to expend resources in an effort to inform their members how individual counties intend to administer the November 3, 2020 general election and where in-person voting opportunities are located.  As such, the Organizational Plaintiffs' purpose of educating Republican voters—especially those who wish to vote in person—on available voting opportunities is necessarily impacted by the Directive.

Organizational Plaintiffs have provided the Court with declarations to this effect.  For example, the Declaration of Sam Rubino explains how expenditure of resources is necessary to "inform voters about the directive's changes" to voting opportunities, including "when, and where to submit mail-in ballots if they have never submitted one before; and where to cast a traditional ballot at whatever in-

person polling locations counties may provide." (Doc. 94-1 at 3.) The remaining declarations submitted by Ryan Dollar and Spenser Merwin confirm the expenditure of resources necessary to educate the Organizational Plaintiffs' members on the Directive's impact on voting in Montana for the November 3, 2020 general election. (Docs. 93-1 at 3; 93-2 at 3–4.) This is sufficient to confer the Organizational Plaintiffs with organizational standing. Having found that the Organizational Plaintiffs and Voter and Candidate Plaintiffs have standing, the Court possesses the constitutional authority to adjudicate all of the Plaintiffs' claims on the merits. As such, the Court need not address the standing of Legislative Plaintiffs, who assert claims identical to that of the Lead-Plaintiffs.

### C. Abstention.

Governor Bullock urges this Court to abstain from resolving Plaintiffs' claims on the merits under the *Pullman* abstention doctrine. "The *Pullman* abstention doctrine is a narrow exception to the district court's duty to decide cases properly before it which allows postponement of the exercise of federal jurisdiction when 'a federal constitutional issue . . . might be mooted or presented in a different posture by a state court determination of pertinent state law.'" *C-Y Development Co. v. City of Redlands*, 703 F.2d 375, 377 (9th Cir. 1983). *Pullman* abstention is only appropriate upon satisfaction of a three-prong test:

(1)  The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open;"

(2)  Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy; and

(3)  The possibly determinative issue of state law is doubtful.

*Id.* In applying these factors, the narrowness of this exception cannot be understated, and this Court should only abstain "in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id.* The Court find abstention inappropriate in this case.

Regarding the first prong, the Court agrees that Plaintiffs' claims regarding Montana's electoral processes touches on a sensitive area of social policy. But it cannot be said this is an area federal courts are hesitant to enter. On the contrary, federal courts are routinely tasked with resolving issues related to the state administration of elections. *See, e.g., Crawford v. Marion Cty Election Bd.*, 553 U.S. 181 (2008). The Court also finds that resolution of the state law issues underlying this dispute will not terminate the action. On the contrary, determination of whether Governor Bullock has exceeded his authority under state law is separate and distinct from the question of whether the provisions providing such authority comport with the Elections and Electors clauses. This second

question is as essential to the resolution of the Emergency Powers Claims as the first.

Finally, as discussed at length below, the Court finds that the state law issues underlying this case are far from uncertain and are readily determinable by the Court. In short, this is not the unique case in which abstention is justified. Governor Bullock urges this Court to follow the abstention path paved by the Western District of Pennsylvania in a similar case. *See Trump for President, Inc. v. Boockvar*, 2020 WL 4920952 (W.D. Pa. 2020). But the Court finds this case distinguishable. While not determinative, a compelling justification for abstention in *Boockvar* was the actual existence of state law proceedings that would resolve the state law issues present in that case. *Id.* at *18. No party to this action disputes that time is of the essence. Ballots are set to be mailed on October 9, 2020. (Doc. 81-15 at 4.) The Court does not find it wise to force Plaintiffs to assert identical claims in state court at this late hour with no promise of timely adjudication. *Potrero Hills Landfill v. County of Solano*, 657 F.3d 875, 889–90 (9th Cir. 2011) ("Federal courts are not required to send a case to the state court if doing so would simply impose expense and long delay upon the litigants without hope of its bearing fruit . . . to the contrary, under such circumstances, it is the duty of a federal court to decide the federal question when presented to it") (internal

quotation marks and citations omitted).  In short, abstention is neither required nor appropriate in this case.

## II.      Injunctive Relief.

Having concluded that the Eleventh Amendment does not bar consideration of the Plaintiffs' Emergency Powers Claims, that standing exists, and that abstention is inappropriate, the Court will adjudicate the claims presented on the merits.  As noted above, in order to obtain injunctive relief, Plaintiffs must demonstrate: (1) actual success on the merits; (2) that they have suffered an irreparable injury; (3) there exists no adequate remedy at law; and (4) the balance of the hardships justifies a remedy in equity and the public interest would not be disserved by a permanent injunction.  *Independent Training*, 730 F.3d at 1032; *Jewell*, 747 F.3d at 1092.[5]  Each element is discussed in turn.

### A.      Actual Success on the Merits.

#### i.      Emergency Powers Claims.

The United States Constitution provides, in relevant part, that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."  U.S. Const., art. I, § 4, cl. 1. Additionally, Article II mandates that "Each State shall appoint, in such Manner as

---

[5] The Court notes that Plaintiffs also request declaratory relief to the effect that the Declaration is unconstitutional.  However, because the issuance of this relief is dependent on Plaintiffs' actual success on the merits, the Court finds separate analysis of these claims unnecessary.

the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ." *Id.*, art. II, § 1, cl. 2.

Plaintiffs contend that the Directive violates these clauses by altering the manner in which Montana conducts the November 2, 2020 general election through executive fiat rather than legislative action.  In support of their argument, Plaintiffs invoke a myriad of provisions of the Montana Code Annotated which they contend either fail to permit or outright prohibit Governor Bullock from issuing the Directive.  The Defendants maintain that not only has Governor Bullock acted well within the authority conferred on him by the Montana Legislature, but that this delegation of power does not offend the Elections or Electors Clauses.

Resolution of these claims requires the Court to analyze the relevant statutory framework under which Montana conducts its elections and by which Governor Bullock purports to act.  In doing so, the critical question becomes whether the Montana Legislature has, in its laws governing the manner in which federal elections are administered, permitted Governor Bullock to authorize counties to conduct such elections, in part, by mail ballot.  The Court is convinced it has.

As a starting point, the Court notes that the Montana Constitution provides

25

that the "legislature shall provide by law the requirements for . . . administration of

elections."  Mont. Const. art. IV, § 3.  In exercise of this constitutional command,

the Montana Legislature has adopted a comprehensive framework of laws

governing the electoral process.  Relevant here are the provisions outlining the

process by which elections can be conducted by mail.  In passing such laws, the

Montana Legislature stated:

> The purpose of this chapter is to provide the option of and procedures
> for conducting certain specified elections as mail ballot elections. The
> provisions of this chapter recognize that sound public policy
> concerning the conduct of elections often requires the balancing of
> various elements of the public interest that are sometimes in conflict.
> Among these factors are the public's interest in fair and accurate
> elections, the election of those who will govern or represent, and cost-
> effective administration of all functions of government, including the
> conduct of elections. The provisions of this chapter further recognize
> that when these and other factors are balanced, the conduct of
> elections by mail ballot is potentially the most desirable of the
> available options in certain circumstances.

Mont. Code Ann. § 13-19-101.

Notably, the provisions of Montana law permitting an election to be

conducted by mail-ballot provide that "a regularly scheduled federal, state, or

county election" cannot "be conducted by mail ballot."  Mont. Code Ann. § 13-19-

104(3)(a).  Montana's statutory framework regarding the administration of

elections cannot be read in isolation, however, and particular attention to the

emergency powers afforded to the Governor must be paid.  Specifically, the

Montana Legislature has provided Governor Bullock with the power to "suspend

26

the provisions of any regulatory statute prescribing the procedures for conduct of state business or orders or rules of any state agency if the strict compliance with the provisions of any statute, order, or rule would in any way prevent, hinder, or delay necessary action in coping with the emergency or disaster." Mont. Code Ann. § 10-3-104(2)(a).

Emergency is defined as "imminent threat of a disaster causing immediate peril to life or property that timely action can avert or minimize." *Id.* § 10-3-103(8). Disaster is defined as "the occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any . . . outbreak of disease." *Id.* 10-3-103(4). The Court has no trouble concluding that the COVID-19 pandemic constitutes a disaster and emergency within the meaning of the aforementioned statutes. As such, the Court must determine whether Governor Bullock has exceeded his authority under Montana Code Annotated § 10-3-104(a)(2).

The parties devote significant argument to whether the statute in question, Montana Code Annotated § 13-19-104, is regulatory and therefore falls within Governor Bullock's suspension power conferred on him through Montana Code Annotated § 10-3-104(a)(2). Plaintiffs urge this Court to construe "regulatory" narrowly, limiting the term to licensing statutes or other public service laws enacted pursuant to Montana's inherent police powers. Defendants argue for a

broader reading, characterizing regulatory statutes as those which apply to the conduct of state actors.

Statutes governing the electoral process are by their very nature regulatory. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (construing Ohio's statutory deadline for candidacy statements as part of its "regulation of elections" and exercise of the state's "important regulatory interests"); *Burdick*, 504 U.S. at 433–34 (interpreting Hawaii's statutory framework regarding write-in voting as a facet of "the State's important regulatory interests . . . ."); *Crawford*, 553 U.S. at 203 (referring to Indiana's voter identification statute as a "neutral, nondiscriminatory regulation of voting procedure").

Indeed, the statute at issue does not permit the Governor to suspend any regulatory statute, but rather only those regulatory statutes that prescribe "the procedures for conduct of state business." Mont. Code Ann. § 10-3-104(2)(a). None of the cases relied on by Plaintiffs interpret the reach of the Governor's suspension power. Instead, Plaintiffs point to a series of Montana cases using the words "regulatory statute" completely divorced from the situation at hand and the powers at play. One case for example, characterizes the Montana Unfair Trade Practices Act as a "regulatory statute." *Mark Ibsen, Inc. v. Caring for Montanans, Inc.*, 371 P.3d 446, 455. But *Mark Ibsen* refers to the Montana Unfair Trade Practices Act which regulates "trade practices in the business of insurance," not the

28

conduct of state business.  *Id.*; *see also* Mont. Code Ann. § 33-18-101.  The failure
to connect the word regulatory to "conduct of state business" severely undermines
Plaintiffs' proposed interpretation.

The Court is convinced that the statute at issue here, Montana Code
Annotated § 13-19-104(3)(a), which forbids local officials from conducting a
"regularly scheduled federal, state or county election" by mail ballot, is precisely
the sort of regulatory statute that falls within Governor Bullock's statutory
suspension power.  After all, the administration of federal, state, and local elections
is quintessentially state business.  *See Clingman v. Beaver*, 544 U.S. 581, 586
(2005) (noting that the Constitution "grants States broad power to prescribe the
Times, Places and Manner of holding Elections for Senators and Representatives . .
. which power is matched by state control over the election process for state
offices") (internal citations and quotation marks omitted).  As discussed below, the
Court has no trouble concluding that suspension of Montana Code Annotated § 13-
19-104(3)(a) is necessary to facilitate Montana's effective response to the COVID-
19 pandemic.  The provisions on which Governor Bullock relies in issuing the
Directive not only provide him with such authority, but likewise constitute a
fundamental part of the legislative enactments governing the time, place, and
manner of elections in Montana and how electors are appointed.

But this does not end the matter, because there is the additional question of

whether such delegation by the Montana Legislature to Governor Bullock is constitutional.  Resolution of this question depends on the meaning of the term "Legislature" as used in the Elections and Electors Clauses.  As an initial matter, the Court finds no need to distinguish between the term "Legislature" as it is used in the Elections Clause as opposed to the Electors Clause.  Not only were both these clauses adopted during the 1787 Constitutional Convention, but the clauses share a "considerable similarity." *Arizona State Legis. v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, J., dissenting).

Additionally, "[w]herever the term 'legislature' is used in the Constitution, it is necessary to consider the nature of the particular action in view" before affording it a certain meaning. *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  With this in mind, the Court finds that the term "Legislature" is used in a sufficiently similar context in both clauses to properly afford the term an identical meaning in both instances.  Specifically, the term "Legislature" as used in both clauses refers to a state's legislative function as opposed to the term's use in other places in reference to an electoral, ratifying, or consenting function. *Id.* at 365–66.  As such, the Court conducts a singular analysis in resolving both constitutional questions.

A survey of the relevant case law makes clear that the term "Legislature" as used in the Elections Clause is not confined to a state's legislative body.  On the contrary, nearly a century ago the Supreme Court concluded that the term

"Legislature did not mean the representative body alone" but also "a veto power lodged in the people" by way of the Ohio Constitution's referendum process. *Davis v. Hildebrant*, 241 U.S. 565, 566–70 (1916).  The Supreme Court followed the trajectory established by *Davis* several years later in *Smiley v. Holm*, where it concluded that the term "Legislature" in the Elections Clause did not "preclude[] a state from providing that legislative action in districting the state for congressional elections shall be subject to the veto power of the Governor as in other cases of the exercise of the lawmaking power."  285 U.S. 355, 372–73 (1932).  Thus, after *Davis* and *Smiley* it was clear that the term "Legislature" in the Elections Clause included not only a state's lawmaking body, but also the citizens' referendum power and the Governor's veto.

The Supreme Court expanded, rather than abandoned, this interpretation of the term "Legislature" just five years ago.  There, the Supreme Court concluded that the term "Legislature" in the Elections Clause also encompasses an independent redistricting commission utilized by Arizona to draw congressional districts.  *Arizona State Legis.*, 576 U.S. at 804–09.  In doing so, the Supreme Court concluded the Elections Clause "respect[s] the State's choice to include" the people's referendum power, the Governor's veto, and an independent restricting commission in decisions regarding the times, places, and manners of federal elections.  *Id.* at 807.

Upon review of these cases, the Court finds no reason to conclude that the Montana Legislature's decision to afford the Governor's statutory suspension power a role in the time, place, and manner of Montana's federal elections should not be afforded the same respect.  In other words, Governor Bullock's use of the legislatively created suspension power is not repugnant to the constitutional provisions invoked by Plaintiffs.[6]  As such, the Court finds that the Directive violates neither the Elections or Electors clause of the United States Constitution and judgment in favor of the Defendants on this claim is appropriate.

## ii.    Right to Vote Claims.

While not specifically enumerated, "[u]ndeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).  This right is "individual and personal in nature." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018).  Additionally, this right "can neither be denied outright . . . nor destroyed

---

[6] Plaintiffs reference in passing Article III, § 1 of the Montana Constitution which forbids "the exercise of power properly belonging to one branch" by another.  But not only have Plaintiffs failed to assert a stand alone claim under the Montana Constitution, jurisdictional issues attendant to such a claim aside, this constitutional provision does not require "absolute independence" which "cannot exist in our form of government." *Powder River Cty v. State*, 60 P.3d 357, 231–32 (Mont. 2002).  On the contrary, this provision "has never been accepted as an absolute principle in practice" and is designed to prevent "a single branch from claiming or receiving inordinate power" rather than "bar[ring] cooperative action among the branches of government." *Id.* at 232.  Cooperative action in the administration of elections and response to an emergency are exactly what has occurred here.  As such, the Court has serious doubts about the merits of a state constitutional claim, assuming it had properly been raised in this case.

by alteration of ballots . . . nor diluted by ballot-box stuffing." *Reynolds*, 377 U.S. at 554. The parties have focused their argument on whether a claim for vote dilution rooted in the United States Constitution is cognizable. The Court finds such an analysis to be unnecessary because, even assuming such a claim exists, Plaintiffs have not even attempted to introduce the requisite evidence necessary to prevail.

The Plaintiffs maintain that because the Directive permits counties to conduct the November 3, 2020 general election by mail ballot, this election will be ripe with fraud and thus result in unconstitutional disenfranchisement of a both direct and dilutive nature. Yet, Plaintiffs have not introduced even an ounce of evidence supporting the assertion that Montana's use of mail ballots will inundate the election with fraud. Indeed, as indicated at the beginning of this Order, at the September 22, 2020 hearing on the merits, counsel for both the Member-Plaintiffs and Lead-Plaintiffs conceded they do not possess any evidence establishing prior incidents of voter fraud in Montana, which has an established and well used absentee voting system. The Court is thoroughly unconvinced that will change in counties electing into the Directive's mail ballot option.

The record is replete with evidence that Montana's elections and the use of mail ballots present no significant risk of fraud. The Declaration of Dr. Michael Herron is particularly enlightening. There, Dr. Herron concludes that there is

absolutely no evidence that deliberate voter fraud has occurred in Montana from 2012 to 2020.  (Doc. 75-2 at 21.)  Particularly, Dr. Herron concludes that "[v]oter fraud of all types is rare in the United States and rare in Montana as well."  (*Id.*)  Upon systematic dissection of the Lead-Plaintiffs' motion (Doc. 8), Dr. Herron concludes that they have failed to "establish a compelling likelihood that voter fraud will occur in Montana if this state uses universal vote-by-mail in the November election."  (Doc. 75-2 at 22.)

The Court also agrees that "[t]he most appropriate comparison election for the upcoming, statewide November 2020 General Election in Montana is the statewide, June 2020 Primary election in Montana" in which no evidence of voter fraud has been uncovered.  (*Id.* at 34, 37.)  The declarations provided by Governor Bullock from three election officials in Montana fortifies the conclusion that a county's use of mail ballots does not meaningfully increase the already nominal risk of voter fraud in this State.  (Docs. 81-3 at 4; 81-4 at 5.)  The Intervenor-Defendants have similarly provided the Court with deposition testimony from various state officials confirming the lack of prior voter fraud in Montana.  (Doc. 75-5 at 4, 9–10; 75-6 at 4–6; 75-7 at 4–5; 75–8 at 3–5.)

Additionally, the Court finds no reason to believe that the electoral safeguards designed to protect the integrity of Montana's elections and prevent fraud will not operate as they have in the past.  These include, but are not limited

to, Montana's proscription on voting twice in one election, Montana's ban on fraudulent voter registration, and the required signature verification upon receipt of a mail ballot.  Mont. Code Ann. §§ 13-13-241, 13-19-309, 13-35-209, 13-35-210(1).  None of these statutory provisions have been suspended by Governor Bullock's Directive.

The Member-Plaintiffs point to the Supreme Court's dicta in *Crawford* as conclusive evidence of voter fraud.  (Doc. 3 at 3.)  But *Crawford* does not limit its discussion of possible voter fraud to mail ballots.  Instead, *Crawford* discusses prior instances of voter fraud in the registration, in-person voting, and absentee voting contexts.  553 U.S. at 194–95, ns. 11–13.  Additionally, the Supreme Court in *Crawford* did not deploy its discussion of voter fraud to invalidate an entire electoral scheme—as Plaintiffs seek to do here—but rather to justify the imposition of the exact sort of safeguards previously discussed.  *Id.* at 196.

Furthermore, if reliance on *Crawford* alone without any supporting evidence were enough, it is unclear how our republic could be expected to conduct elections at all.  Litigants could simply attack any electoral structure as inviting fraud and thus offensive of the constitutional rights Plaintiffs invoke here.  Such a result would cripple our great democratic experiment and bolster forces determined on thwarting popular government.  In the final analysis, the Court finds that Plaintiffs have not established that the use of mail ballots by Montana counties will introduce

any meaningful level of fraudulent behavior into the election that could possibly rise to the level of a constitutional violation.

The Lead-Plaintiffs also allege that the Directive infringes on the right to vote because the "sudden surge in mail ballots" will result in requested ballots never arriving, arriving too late, or completed ballots getting lost or delayed in the return process.  But this contention suffers from the same fatal flaw as that based on voter fraud, an utter lack of any supporting evidence.  The Plaintiffs have failed to provide any proof that Montana's mail system will be unable to process an influx in ballots.  It takes more than mere supposition to prevail on the merits. Plaintiffs' claim regarding errors in the mail system suffers the same fate as those rooted in voter fraud.

### iii.    Equal Protection Claim.

The Member-Plaintiffs' Equal Protection Claim lacks clarity.  In their complaint, the Member-Plaintiffs rely on the Court's holding in *Bush v. Gore* and allege that because "46 of 56 Montana counties have filed mail-ballot plans," if such plans are approved "voters in the 46 counties will have greater voting power than other-county voters."  (Doc. 1 at 38.)[7]  The complaint further alleges that the Directive "enhances the odds of voters in counties adopting" it of "being able to

---

[7] As noted in this Order, the number of counties currently opting in under the Directive is 45 not 46.

vote and have their voices counted" and "[a]s a result, proportionally more votes will be obtained from in-Plan counties than from other counties—with the difference not being accounted for by population differences." (*Id.*)

The briefing submitted by Member-Plaintiffs fails to further illuminate the argument, simply contending that the Directive is a "disparate-power Plan" that provides some voters with greater voting power. (Doc. 91 at 12.) At oral argument, counsel for Member-Plaintiffs confused the issue by characterizing their equal protection argument as being rooted in the risk of voter fraud attached to the use of mail ballots. To the extent voter fraud plays a role in the Equal Protection Claim, which is not clear from the face of the complaint, such a claim can be easily disregarded for the reasons discussed above, again the complete absence of any evidence establishing that voter fraud has occurred in the past or is likely to occur by way of the Directive in Montana.

In *Bush v. Gore*, the Supreme Court reiterated the longstanding principle that "one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." 531 U.S. 98, 107 (2000). Particularly, the Supreme Court held that "[e]qual protection applies" to the right to vote and "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104–05. Applying these principles, the Supreme Court found that

the Florida Supreme Court's ratification of disparate standards used by counties to determine what is or is not a valid vote resulted in the arbitrary and disparate treatment forbidden by the Equal Protection Clause.  *Id.* at 104–09.  The Court finds no such equal protection issue here.

First, the Supreme Court was clear in *Bush v. Gore* that the question was not "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections."  *Id.* at 109.  Yet this is precisely the conduct of which the Member-Plaintiffs now complain.  The crux of their argument, as pled in their complaint, is that the use of a mail ballot system by some counties and not others results in unconstitutionally disparate treatment.  The Court agrees with Governor Bullock's argument that few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause.

Second, in any event, the Court finds Member-Plaintiffs' complaints of disparate and unequal treatment unfounded.  The Directive makes clear that even in counties electing to opt into Montana's mail ballot procedure for the November 3, 2020 general election, in-person voting opportunities will remain available. (Doc. 81-15 at 3.)  Additionally, the Member-Plaintiffs have not introduced any evidence that the 11 Montana counties electing to conduct the election without the use of mail ballots are utilizing procedures that render voters in those counties less

likely to have their votes cast.  Likewise, nothing in the record supports the claim

that the counties who have opted to proceed under the Directive are more likely to

permit their citizens to successfully cast a ballot.  As such, the Directive does not

condone or facilitate any disparate treatment of Montana voters, and instead, is

designed to ensure that all eligible Montanans can vote in the upcoming election.

In sum, the Member-Plaintiffs Equal Protection Claim is without merit.

As the foregoing illustrates, Plaintiffs do not enjoy actual success on the

merits of any of their claims.  This conclusion alone precludes Plaintiffs' request

for injunctive relief.  *See Confederated Tribes & Bands of Yakama Nation v.*

*Yakama Cty.*, 963 F.3d 982, 993 (9th Cir. 2020) (concluding that Yakama Nation

was not entitled to a permanent injunctive after failing to show actual success on

the merits).  Nonetheless, the Court finds it prudent to address the remaining

factors.

**B.   Irreparable Injury.**

To establish this factor, Plaintiffs must demonstrate that they have suffered

irreparable injury.  It is not lost on this Court that constitutional violations are often

sufficient in and of themselves to establish irreparable harm.  *Goldie's Bookstore,*

*Inc. v. Superior Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984); *Associated Gen.*

*Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th

Cir. 1991).  As noted above, the entirety of Plaintiffs' claims consist of purported

constitutional violations.  But, as discussed at length, none of these claims are

meritorious.  Thus, Plaintiffs have not suffered any irreparable injury.

Consequently, this factor weighs in Defendants' favor.

### C.    Adequacy of Remedies at Law.

In analyzing this factor, the Court notes that "unlike monetary injuries,

constitutional violations cannot be adequately remedied through damages."

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal citations

and alterations omitted).  This notion, of course, depends on the actual finding of a

constitutional violation, which is not present in this case.  Having found no

constitutional violation, the Court holds that Plaintiffs are not entitled to any relief,

equitable or otherwise.

### D.    Balance of Hardships and Public Interest.

In conducting the final injunctive inquiry, this Court heeds the Supreme

Court's warning against changing the rules of the game on the eve of an election.

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207

(2020) (internal citations omitted).  This warning necessarily cautions against the

issuance of injunctive relief in this case, just days before ballots are to be mailed

by counties who have elected to utilize the mail ballot procedures authorized by the

Directive.

Indeed, federal courts have time and time again been cautioned against

40

injecting themselves into the electoral process.  *See, e.g., Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (holding "[t]here is no doubt that the right to vote is fundamental, but a federal court cannot lightly interfere with or enjoin a state election").  In fact, "[t]he decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation." *Id.* (collecting authority).

This restraint on the issuance of injunctive relief is unsurprising, because ultimately an "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32.  Accordingly, even if Plaintiffs' had actually succeeded on the merits of their claims, which they have not, it does render the issuance of an injunction preordained.  On the contrary, the Court is compelled to carefully balance the equities and the public interest before awarding the extraordinary relief Plaintiffs' seek.  In doing so, the Court finds that this factor weighs strongly in the Defendants' favor.

The evidence in the record demonstrates that issuance of the injunctive relief sought by Plaintiffs would have profound, and most likely catastrophic consequences on the administration of Montana's general election.  Election officials have extensively outlined the nearly insurmountable challenges which would arise should the Court enjoin enforcement of the Directive.  These include:

(1) the impossibility of procuring, training, and certifying the competency of the election judges necessary to administer an election in the absence of mail ballot procedures; (2) the logistical nightmare posed by completely reversing course at this late hour and moving from a mail ballot to traditional election administration; and (3) the difficulty, harm to election integrity, and resulting confusion that would occur if counties had to notify their citizens of the abrupt last minute change to available voting opportunities.  (Docs. 81-3 at 2–3; 81-4 at 2–4; 81-15 at 7–13.) These concerns are well founded and provide strong equitable and public interest considerations against enjoinment of the Directive.

This Court finds that it would not only be unequitable, but also strongly against the public interest, to upset the current election procedures of 45 Montana counties just days before mail ballots are to be sent to registered voters.  Those 45 counties would be forced, likely in vain, to quickly develop the electoral infrastructure necessary to administer the general election under normal conditions. The result is the possible disenfranchisement of thousands of Montana voters who as of the date of this Order, are operating under the belief that they will shortly receive a ballot in the mail.  Issuance of an injunction presumes counties could successfully notify these voters of the need to apply for an absentee ballot (which may not be successfully processed in time) in order to vote from the safety of their home or that these voters will be willing to brave the pandemic and exercise their

franchise in person.  Both are unlikely.  As such, the injunction Plaintiffs' seek would likely bring about significant disenfranchisement.

Irrespective of these administrative issues, the Court also finds that enjoinment of the Directive would only accelerate the outbreak of COVID-19 which Montana now faces.  Contrary to Plaintiffs' assertions that Montana is out of the woods and free from the virus that continues to cripple society across the globe, Montana continues to struggle with outbreaks across the state.  In fact, as of September 29, 2020, and as the following graph indicates, Montana's COVID-19 cases continue to rise, with a commensurate increase in deaths.



*Montana Covid Map and Case Count*, N.Y. TIMES, https://nyti.ms/2R3F2S9 (last visited September 29, 2020).  It is not hard to imagine that enjoinment of the Directive would vastly increase the number of Montanans exercising their

franchise in person during the election.  Given the contraction of available in-person voting opportunities, this influx of in person voters would obviously hasten the already increasing spread of COVID-19 infections in Montana.

Indeed, these health concerns were the primary basis on which Governor Bullock rooted the Directive.  (Doc. 81-15 at 2–3.)  Evidence submitted in this case raises compelling public health concerns stemming from enjoinment of the Directive.  (*See, e.g.,* Doc. 81-1 at 6.)  The Declaration of Dr. Gregory Holzman, for example, outlines at length the safety measures necessary to safely conduct an election by predominately in-person voting.  (Doc. 81-5 at 5–6.)  In the end, however, Dr. Holzman concludes that "last minute changes that eliminate mail voting would require substantial effort by election administrators to provide for high-density, crowded polling place election procedures that satisfy the" necessary safety measures.  (*Id.* at 7.)

Governor Bullock has provided the Court with a declaration from a resident of Cascade County, Montana who intends to vote in the upcoming election.  (Doc. 81-6 at 2.)  Because of this voter's health conditions, voting in person is simply not possible.  (*Id.* at 2–3.)  Enjoining the Directive would effectively disenfranchise this voter, who, based on the administrative issues outlined above, would unlikely be able to successfully register for and receive an absentee ballot prior to election day.  This voter does not exist in isolation, and in-person voting by his family

44

members and friends, which would be increasingly likely if the Directive was enjoined, would vastly increase his own risk of viral exposure with possibly deadly consequences.  (*Id.*)  These concerns are likely not unique and apply with equal force to many Montanans, who either themselves or a loved one suffer from a medical condition for which COVID-19 exposure poses a grave risk.

Ultimately, considerations of public health weigh strongly against the issuance of an injunction, even if Plaintiffs' claims were meritorious.  Having weighed the requisite factors, the Court concludes that Plaintiffs are not entitled to injunctive relief.  Because they have not actually succeeded on the merits of any of their claims, the Court additionally finds that they are not entitled to any of the relief they seek.  As such, judgment in favor of the Defendants in both the lead and member cases is warranted.

Accordingly, IT IS ORDERED that the Plaintiffs' requests for injunctive, declaratory, or any other form of relief are DENIED.

IT IS FURTHER ORDERED that judgment in both the lead case (CV 20–66–H–DLC) and the member case (CV–20–67–H–DLC) shall be entered in the Defendants' favor.

IT IS FURTHER ORDERED that all pending motions are DENIED as moot.

The Clerk of Court is directed to enter judgments in the lead and member

cases by separate documents and close the case files.

DATED this 30th day of September, 2020.

Dana L. Christensen, District Judge
United States District Court